**ECF CASE**

JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CIV 7905

------------------------------------------------------------x
KOLMAR AMERICAS, INC.,                    :
                                          :
                Plaintiff,                :     CIVIL ACTION NO. _____
                                          :
        -- against --                     :
                                          :
KOCH SUPPLY & TRADING L.P.,               :
                                          :     **TRIAL BY JURY DEMANDED**
                Defendant.                :
                                          :
------------------------------------------------------------x

## COMPLAINT

Plaintiff Kolmar Americas, Inc. ("KOLMAR"), through their attorneys, KELLEY, DRYE & WARREN LLP and LENNON MURPHY CAULFIELD & PHILLIPS, LLC, bring this action against defendant Koch Supply & Trading, L.P. ("KOCH" or "Defendant") and alleges as follows:

### THE PARTIES

1.      Plaintiff KOLMAR is a corporation organized under the laws of Delaware with its principal place of business at 10 Middle Street, Bridgeport, Connecticut 06604. KOLMAR is a virtual integrated petroleum and petrochemicals company and specializes in function trading of heavy petroleum to lighter petroleum products, a large variety of petrochemicals and energy products including, without limitation, different biofuels and coal

2.      Defendant KOCH is a Delaware limited partnership with its principal place of business at 4111 E. 37th St. North, Wichita, Kansas 67220 and also maintains offices in New York City. Upon information and belief, KOCH is engaged in the trading of crude oil, refined products, derivatives, natural gas liquids, olefins, natural gas, power and emissions, metals, foreign currency, interest rates and exchange-traded commodities and freight. KOCH also

provides various energy trading risk management services to certain of KOCH's counterparties to manage price and cost volatility. Service of process may be accomplished, *inter alia*, by serving KOCH's registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

### JURISDICTION AND VENUE

3. This Court has original jurisdiction over this action under 28 U.S.C. § 1332, because this is a civil action between citizens of different states in which the matter and controversy exceeds the sum or value of $75,000, exclusive of interest or costs.

4. Plaintiff KOLMAR is a citizen of Delaware and Connecticut for diversity jurisdiction purposes. Upon information and belief, KOCH is a citizen of Kansas because of the citizenship of its partners. KOLMAR is not a citizen of Kansas.

5. This Court also has original jurisdiction over this action under 28 U.S.C. § 1333(1) based on the maritime/admiralty nature of the claims and likely defenses in this action.

6. Personal jurisdiction exists over KOCH, upon information and belief, in that KOCH maintains a regular place of business in New York; is registered to transact business in New York; and, pursuant to contractual forum selection clauses providing that any litigation or other dispute that might arise between KOLMAR and KOCH would be heard only in New York.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a).

### COUNT ONE – BREACH OF CONTRACT

8. On or about January 19, 2010, KOLMAR, as buyer, entered into an agreement with KOCH, as seller, pursuant to which KOCH agreed to sell to KOLMAR approximately 110,000 metric tons (+/-5% at KOLMAR's option) of Mixed Xylene feedstock (the "Product"), which Product was to be delivered in eleven (11) monthly installments between February 1, 2010

2

and December 31, 2010 (sometimes referred to herein as the "Agreement"). Certain material terms of the parties' Agreement were later memorialized and confirmed in various written confirmations subsequently exchanged between KOLMAR and KOCH.

9. Under the terms of the Agreement, KOCH promised to sell and deliver to KOLMAR approximately 10,000 metric tons (MT) of Product (+/- 5% at KOLMAR's option) on a monthly basis starting in February 2010 and each month thereafter through December 2010.

10. Under the terms of the Agreement, KOCH was to deliver each of the monthly installments of Product to KOLMAR, at KOCH's option, to either the Ports of Houston/Texas City, Freeport, Texas, Port Arthur, Texas or Corpus Christi, Texas. At its option, KOCH was permitted to split its monthly delivery of Product into two (2) deliveries of 5,000 MT each (+/- 5% at KOLMAR's option).

11. KOCH was to deliver each of the monthly installments of Product to KOLMAR on an FOB basis at the above referenced ports to be loaded onto a vessel or barge chartered by KOLMAR.

12. Consistent with the Agreement, KOCH and KOLMAR successfully concluded the first seven (7) monthly deliveries of Product for February, March, April, May, June, July and August 2010.

13. Under the terms of the Agreement, KOCH was to deliver 10,000 MT of Product (+/- 5% at KOLMAR's option) to KOLMAR in September 2010. In terms of the exact quantity, KOCH and KOLMAR agreed that KOCH would load a total of 10,100 MT of Product onto KOLMAR's vessel.

3

14. On August 12th and 13th, 2010, KOLMAR nominated the motor tanker FORMOSA TEN as the performing vessel (the "FORMOSA TEN") to load KOCH's September delivery of the Product in Houston.

15. KOCH accepted KOLMAR's nomination of the FORMOSA TEN as the performing vessel on or about August 23, 2010. On or about August 24, 2010, KOLMAR fixed the FORMOSA TEN with the ship-owner, Formosa Plastics Carrier Corporation ("FORMOSA"). At the time, KOLMAR understood from KOCH that the entire September parcel of 10,000 MT would be delivered by KOCH to KOLMAR'S nominated vessel at the ITC Terminal in Houston.

16. Subsequently, KOCH informed KOLMAR that the September Product would be delivered on a split (50-50%) basis between the ITC Terminal in Houston and the Valero Terminal in Corpus Christi. KOLMAR initially arranged for the FORMOSA TEN to load the first ½ of the Product in Corpus Christi on September 24th and the other ½ of the Product in Houston starting on September 26th.

17. Shortly thereafter, KOCH informed KOLMAR that KOCH would not yet have the necessary quantity of Product available to deliver to KOLMAR at Corpus Christi upon the FORMOSA TEN's planned September 24th arrival into Corpus Christi.

18. KOCH was contractually obligated to have the entire 10,100 MT of Product available for loading in both Houston and Corpus Christi by September 24th. Thus, if KOLMAR had insisted on first tendering notice of readiness ("NOR") for the FORMOSA TEN to commence taking delivery at Corpus Christi on September 24th -- as was Kolmar's contractual right -- the FORMOSA TEN would have incurred substantial demurrage charges because KOCH did not have Product available to load in Corpus Christi, for which demurrage costs KOCH

would have been responsible under the terms of the Agreement. Likewise, if KOLMAR insisted on loading first at Corpus Christi, KOCH would also likely have been exposed to paying substantial damages to KOLMAR due to KOCH's inability to perform, *inter alia*, because the market price at which KOLMAR would have had to cover was substantially higher than the contract price.

19. In order to minimize KOCH's likely exposure to significant demurrage and/or cover costs, KOLMAR elected not to strictly enforce its contractual rights by declaring KOCH in breach. Instead, KOLMAR sought to accommodate KOCH, *inter alia*, by deviating from (and essentially reversing) the FORMOSA TEN's then planned rotation so that the vessel would load the first ½ of the September Product at Houston and then load the second ½ of the Product at Corpus Christi.

20. As a result of KOLMAR's accommodation, KOCH avoided being placed in breach and was afforded more time by KOLMAR to acquire the approximately 5,050 MT of Product that KOCH was required to deliver at Corpus Christi.

21. On or about September 30, 2010, KOCH finished loading 4,748 MT of Product onto the FORMOSA TEN in Houston (sometimes referred to herein as the "Houston Loading"). Since KOCH was obligated to deliver a minimum of 5,050 MT of Product (i.e., ½ of the total September delivery of 10,100 MT) in connection with the Houston Loading, KOCH breached the Agreement by: (i) short loading the FORMOSA TEN by at least 302 MT of Product in Houston; and, (ii) then subsequently failing to complete the Houston Loading and/or to later cure the Product delivery shortfall as part of the Corpus Christi loading.

22. In order to make up the Product shortfall caused by KOCH's failure to supply the minimum contractually mandated volume of 5,050 MT in connection with the Houston Loading,

KOLMAR was later forced to cover in through a purchase from a third-party at a much higher market price of $2.95 per gallon in order to mitigate its damages. The contractually agreed to formula purchase price for the September delivery of Product was $2.50 per gallon. As a result, this approximately 45 cent per gallon price increase on the cover transaction translated into a substantially higher cost to KOLMAR for the 302 MT Product shortfall KOLMAR suffered in connection with the Houston Loading.

23.     After finishing loading the Product tendered by KOCH at Houston, the FORMOSA TEN was delayed leaving the Port of Houston through no fault of KOLMAR or the FORMOSA TEN. KOLMAR promptly notified KOCH that the FORMOSA TEN would likely be very modestly delayed in arriving at Corpus Christi slightly beyond the end of the September 30th delivery period.

24.     After numerous discussions, KOCH extended the contractual delivery period through and including 23:59:59 hours on October 2, 2010. More specifically, KOCH promised to load the 5,000 MT of Product (+/-5% at KOLMAR's option) so long as the FORMOSA TEN tendered NOR at the Port of Corpus Christi or the customary anchorage at Corpus Christi by 23:59:59 on October 2, 2010.

25.     KOCH also purported to raise the September sales price for the Corpus Christi delivery by 6 cents per gallon (CPG), which KOCH stated was justified due to additional carrying costs that KOCH claimed (without providing any verification) that it would incur as a result of the short delay of the FORMOSA TEN arriving at Corpus Christi. KOLMAR agreed to pay KOCH the additional 6 cents per gallon without prejudice and under a reservation of rights. KOLMAR delivered an amended letter of credit to KOCH on October 1, 20010 in order to secure and facilitate payment to KOCH of this extra 6 CPG.

26. In reliance on KOCH'S assurances that it would make delivery of the remaining Product to KOLMAR at Corpus Christi so long as the FORMOSA TEN tendered NOR at Corpus Christi on October 2, 2010, KOLMAR modified its fixture with FORMOSA and pressed the FORMOSA TEN to expedite its arrival within the Port of Corpus Christi so as to tender NOR before midnight on October 2, 2010.

27. The FORMOSA TEN arrived within the Port of Corpus Christi, and passed the customary anchorage (the Aransas Pass Fairway Anchorage) at approximately 23:30 hours on October 2, 2010, at which date and time it tendered NOR. Thus, KOCH was contractually obligated to load a minimum of 5,050 MT of Product onto the FORMOSA TEN (plus an additional 302 MT if KOCH desired to attempt to cure the 302 MT Product shortfall that had occurred in connection with the still uncompleted Houston Loading).

28. Nonetheless, and despite numerous demands for performance and breach notices sent by KOLMAR, KOCH purported to cancel the Corpus Christi delivery and reneged on its obligation to load the second half of the September Product delivery. KOCH falsely claimed that the FORMOSA TEN failed to tender a "valid" NOR in connection with its arrival at the Port of Corpus Christi.

29. Upon information and belief, and relying on the false pretext that the FORMOSA TEN failed to tender a valid NOR, KOCH re-directed and sold the Product that was supposed to be delivered to KOLMAR in Corpus Christi to a third-party at a substantially higher market price. In fact, upon information and belief, KOCH caused the Product to be loaded into barges already at the Valero Terminal dock within one (1) hour of purporting to cancel its delivery to KOLMAR.

30. Upon information and belief, KOCH's refusal to perform was in bad faith as KOCH knew or reasonably should have known that its proffered excuse for non-performance was utterly baseless and contrived. KOCH was also seemingly motivated to repudiate its contractual obligations to KOLMAR solely by greed (*i.e.*, hoping to unfairly gain at KOLMAR's expense by virtue of KOCH re-selling the remaining un-delivered Product to a 3rd party at the then prevailing substantially higher market price).

31. In addition to breaching the Agreement, KOCH's unfair profiteering at KOLMAR's expense constitutes an unfair and deceptive trade practice and/or a breach of KOCH's implied covenant of good faith and fair dealing owed to KOLMAR under the Agreement and under Article 2 of the New York Uniform Commercial Code

32. After KOCH initially repudiated its delivery obligations under the Agreement for the September delivery, KOLMAR repeatedly pressed KOCH to retract or, barring that, at least adequately explain the basis for its conclusory, cryptic and self-serving assertion that the FORMOSA TEN failed to tender a valid NOR.

33. While these efforts by KOLMAR to try and persuade/shame KOCH into performing were ongoing, the FORMOSA TEN remained in the Corpus Christi area resulting in a *per diem* demurrage charge to KOLMAR of $22,000 (PDRP). If KOLMAR had simply directed the FORMOSA TEN to proceed on to Asia (its next destination) without any further loading of substitute cargo, KOLMAR would have incurred "dead freight" charges payable to the Owner of the FORMOSA TEN of approximately $203,376, which also would have been for KOCH's account. Additionally, KOLMAR needed to cover the 5,050 MT Product shortfall from the aborted Corpus Christi loading plus the 302 MT Product shortfall from the still uncompleted Houston Loading. Thus, in order to best mitigate both its own and KOCH's damages,

KOLMAR needed the FORMOSA TEN to remain in the Corpus Christi area while KOLMAR sought to locate a substitute cargo.

34. It soon became clear to KOLMAR, however, that further efforts to induce KOCH to retract its refusal to perform would be futile. Accordingly, in mitigation of damages, and consistent with KOLMAR's rights under the Agreement and the New York Uniform Commercial Code (including, without limitation, NY UNIF. COMM. CODE §§ 2-610, 2-711, 2-712, 2-713, 2-714 and 2-715), KOLMAR entered into a partial covering transaction with a third-party, Flint Hills Resources, L.P ("FLINT HILLS"), on or about October 6, 2010.

35. More particularly, KOLMAR purchased approximately 4,750 MT of substitute Product (*i.e.*, Mixed Xylene) from FLINT HILLS to be delivered onto the FORMOSA TEN at Corpus Christi starting on or about October 14th or October 15, 2010.

36. In connection with covering KOCH'S delivery shortfall in the open market, KOLMAR was forced to purchase substitute Product at a price ($2.95 per gallon) that was dramatically higher (*i.e.*, by 45 cents) than the KOCH/KOLMAR contract price. Consequently, KOLMAR suffered cover related damages due to KOCH'S breach and repudiation of its delivery obligations presently believed to be in excess of $850,000.

37. Since October 2, 2010, KOLMAR has been able to mitigate some, but not all, of the demurrage/dead freight damages, *inter alia*, by having the FORMOSA TEN make other port calls while awaiting delivery of the substitute product from FLINT HILLS's refinery.

38. Nonetheless, and despite KOLMAR's best efforts to maximize the use of the FORMOSA TEN during the waiting period, KOLMAR has still incurred at least five (5) days of demurrage costs, plus certain diversion costs, for which KOCH is accountable in damages payable to KOLMAR. While KOLMAR does not yet have a final confirmed figure for its

demurrage and diversion costs, these damages are still accruing and are presently estimated to be in excess of $150,000.

39. By virtue of KOCH's above described wilful and bad faith breaches of the Agreement, KOLMAR has incurred and is continuing to incur damages in the form of cover, dead-freight, demurrage and diversion costs (which damages are continuing to accrue), which damages are presently estimated to be in excess of $1 million dollars, exclusive of KOLMAR's considerable and mounting attorneys fees and related disbursements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff KOLMAR requests entry of judgment in its favor and against Defendant KOCH as follows:

1. A judgment for compensatory damages for breach of contract in an amount to be proven by KOLMAR at trial, inclusive of any statutory remedies that might be afforded under Article 2 of the New York Uniform Commercial Code including, without limitation, UNIF. COMM. CODE §§ 2-610, 2-711, 2-712 to 2-715);

2. Pre-judgment and/or post-judgment interest as provided for under applicable New York law;

3. Plaintiffs' reasonable attorneys fees, costs and disbursements as might be allowed under the parties' Agreement and/or applicable law.

4. Such other, further and different relief as the Court deems just and equitable.

### **Demand for Jury Trial**

Plaintiff demands a jury trial on all issues so triable.

Dated: October 16, 2010

THE PLAINTIFF
KOLMAR AMERICAS, INC.

By: _____
James E. Nealon
Seunghwan Kim
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
Phone: (212) 808-7800
Fax: (212) 808-7897
Email: jnealon@kelleydrye.com
Email: skim@kelleydrye.com

– and –

LENNON MURPHY CAULFIELD
& PHILLIPS LLC

Patrick F. Lennon
Kevin J. Lennon
One Graybar Building
420 Lexington Avenue, Suite 420
New York, New York 10170
Phone: (212) 490-6050
Fax: (212) 460-6070
Email: pfl@lmcplegal.com
Email: kjl@lmcplegal.com