UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x



KOLMAR AMERICAS, INC.,                      :

            Plaintiff,                 :

                        :

      -v-                                  :

                        :        10 Civ. 7905 (JSR)

KOCH SUPPLY & TRADING, LP,                  :

            Defendant.                 :        <u>MEMORANDUM ORDER</u>
--------------------------------------x

KOCH SUPPLY & TRADING, LP,                  :

            COUNTERCLAIM PLAINTIFF,:

                        :

      -v-                                  :

KOLMAR AMERICAS, INC.,                      :

            COUNTERCLAIM DEFENDANT.:
--------------------------------------x

JED S. RAKOFF, U.S.D.J.

     On October 16, 2010, Kolmar Americas, Inc. ("Kolmar") filed
a complaint in the above-captioned action asserting a single
claim for breach of contract against Koch Supply & Trading, LP
("Koch").  On November 30, 2010, Koch answered the complaint and
asserted a counterclaim for breach of contract.  Both parties
filed motions for summary judgment on May 27, 2011.  Kolmar moved
for partial summary judgment as to liability on Kolmar's breach
of contract claim as well as summary judgment dismissing Koch's
breach of contract claim.  Koch moved for summary judgment
granting Koch's counterclaim and dismissing Kolmar's claim.
Following full briefing, the Court heard oral argument on August
5, 2011.  After careful consideration and for the reasons
explained in this Memorandum Order, the Court hereby (1) grants

Kolmar partial summary judgment as to liability on its contract claim pertaining to the "Houston Delivery," as that term is defined herein; (2) grants Koch partial summary judgment as to liability on its contract counterclaim with respect to the "Corpus Christi Delivery," as that term is defined herein; and (3) denies all other pending motions.

The relevant, undisputed facts are as follows.  On January 19, 2010, the parties entered into an agreement whereby Koch agreed to sell Kolmar approximately 110,000 metric tons, plus or minus 5 percent at Kolmar's option, of mixed xylene feedstock (the "Product"), to be delivered in eleven monthly installments of 10,000 metric tons each between February 1, 2010 and December 31, 2010.  See Plaintiff's Response to Defendant's Statement of Undisputed Facts and Supplemental Statement of Facts ("Kolmar's 56.1 Response") ¶ 3. Koch and Kolmar subsequently exchanged various written confirmations setting forth the precise terms of the agreement.  Id. ¶ 4.  It is undisputed that Koch's January 21, 2010 confirmation to Kolmar, as amended and restated by Koch's February 17, 2010 confirmation, represents the governing terms of the parties' agreement.  See Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("Kolmar's 56.1) ¶ 10. The January 21 and February 17 confirmations are identical except for the dates and the fact that the February 17 confirmation

provides for the Product to be priced in metric tons as opposed to gallons.  Kolmar's 56.1 Response ¶ 10 n.1.  Accordingly, for the sake of simplicity, the February 17, 2010 confirmation will be referred to as the "Contract."

The Contract contains, *inter alia*, the following provisions:

**QUANTITY:**
. . . .

10000 METRIC TONS PER ENTIRE CONTRACT BETWEEN 1 SEPTEMBER AND 2010 AND 30 SEPTEMBER 2010
. . .

** TWO (2) 5000 METRIC TON LIFTING'S PER MONTH **

+/-5 % -- BUYER OPTION
. . . .

**DELIVERY:**
FOR USCG (**HOUSTON, TEXAS CITY, FREEPORT, PORT ARTHUR, OR CORPUS CHRISTI AT SELLERS OPTION**) BY VESSEL (TBN) / SUB DURING 1 FEBRUARY 2010 TO 31 DECEMBER 2010 (THE "DELIVERY PERIOD").

PRODUCT DELIVERY SHALL BE MUTUALLY SCHEDULED

** BUYER MUST NOMINATE A TEN DAY LAYCAN[1] WINDOW TEN DAYS PRIOR TO THE CONTRACT WINDOW.  TEN DAYS PRIOR TO THE BEGINNING OF THE NOMINATED LAYCAN, BUYER MUST NARROW LAYCAN TO FIVE DAYS WITHIN THE ORIGINAL LAYCAN WINDOW.  FIVE DAYS PRIOR TO THE FIVE DAY LAYCAN, BUYER MUST NARROW THE LAYCAN TO THREE DAYS WITHIN THE FIVE DAY LAYCAN. **

---

[1] "Laycan" is a maritime term that refers to the window of time during which a vessel must arrive at the port under the charter party to avoid cancellation by the charterer.  Koch Supply & Trading, LP's Memorandum of Law in Opposition to Kolmar Americas, Inc.'s Motion for Partial Summary Judgment ("Koch Opp.") at 21 n.7.

NOTWITHSTANDING THE ABOVE, IF A PERFORMING VESSEL TENDERS NOR[2]
WITHIN THE DELIVERY PERIOD, THE BUYER AND SELLER SHALL
COMPLETE LOADING OF THE PRODUCT EVEN IF COMPLETION OF LOADING
TAKES PLACE AFTER THE END OF THE DELIVERY PERIOD.
.  .  .  .

**PERFORMING VESSEL**

THE SELLER SHALL NOTIFY THE BUYER IN WRITING OF THE ACCEPTANCE
(OR REJECTION) OF THE VESSEL AS SOON AS REASONABLY PRACTICABLE
AFTER THE RECEIPT OF A NOMINATION.  THE SELLER SHALL HAVE THE
RIGHT TO REJECT ANY VESSEL, INCLUDING A SUBSTITUTE NOMINATION,
OR REFUSE TO ACCEPT A VESSEL FOR LOADING ON ANY REASONABLE
GROUNDS RELIED UPON IN GOOD FAITH.
.  .  .  .

**LOADING, LAYTIME, DEMURRAGE**

THE BUYER SHALL PROCURE THAT UPON ARRIVAL OF THE PERFORMING
VESSEL AT THE LOADING PORT OR AT THE CUSTOMARY ANCHORAGE OF
THE LOADING PORT, THE PERFORMING VESSEL SHALL TENDER NOR
WITHIN THE DELIVERY PERIOD.
.  .  .  .

THE TIME FOR LOADING SHALL COMMENCE FOR VESSELS:
-IF NOR IS TENDERED PRIOR TO THE START OF THE DELIVERY PERIOD,
AT 6.00 HOURS LOCAL TIME ON THE FIRST DAY OF THE DELIVERY
PERIOD, OR WHEN THE PERFORMING VESSEL IS ALL FAST, WHICHEVER
OCCURS FIRST; OR
-IF NOR IS TENDERED WITHIN THE DELIVERY PERIOD, 6 HOURS AFTER
NOR, OR WHEN THE PERFORMING VESSEL IS ALL FAST, WHICHEVER
OCCURS FIRST; OR
-IF NOR IS TENDERED AFTER THE END OF THE DELIVERY PERIOD, WHEN
THE PERFORMING VESSEL IS ALL FAST.  NOTWITHSTANDING THIS
CLAUSE, THE SELLER HAS AT ITS SOLE OPTION THE RIGHT TO CANCEL
THIS AGREEMENT IF THE NOR IS NOT TENDERED IN THE AGREED
DELIVERY PERIOD.
.  .  .  .

---

[2] "NOR" is a marine term that stands for "Notice of Readiness,"
which is "a formal notification by the vessel that a state of
readiness, either to load or discharge exists at the time when it
is given."  Koch Supply & Trading, LP's Memorandum of Law in
Support of its Motion for Summary Judgment ("Koch Mem.") at 4 n.1
(quoting Julian Cooke et al., Voyage Charters 280 (1993)).

4

**SHIPMENTS:**

DELIVERIES WILL BE MADE IN QUANTITIES AND AT TIMES SPECIFIED
IN THIS ORDER OR IN SUPPLEMENTARY SCHEDULES FURNISHED TO
SELLER BY BUYER AND BUYER MAY CHANGE DELIVERY SCHEDULES AND
TEMPORARILY SUSPEND SCHEDULED SHIPMENTS.
. . . .

(B) TO THE EXTENT FLEXIBILITY IS ALLOWED BY THIS AGREEMENT FOR
TIME OR SIZE OF DELIVERIES, THE PARTIES WILL COOPERATE TO THE
EXTENT REASONABLE TO COORDINATE PERIODS AND TIMES FOR
DELIVERIES HEREUNDER; AND BUYER WILL GIVE REASONABLE PRIOR
NOTICE AS TO QUANTITIES AND SCHEDULING DESIRED.
. . . .

**DEFAULT:**
AN EVENT OF DEFAULT ('EVENT OF DEFAULT') WITH RESPECT TO A
PARTY OR, IF THE OBLIGATIONS OF A PARTY ARE GUARANTEED BY
ANOTHER PARTY WHETHER UNDER THIS CONTRACT OR OTHERWISE, THE
GUARANTOR OF SUCH PARTY (EACH OR EITHER A 'DEFAULTING PARTY')
SHALL MEAN ANY OF THE FOLLOWING –
. . . .

(B) THE FAILURE OF THE DEFAULTING PARTY TO COMPLY WITH ITS
OTHER OBLIGATIONS UNDER THIS CONTRACT AND SUCH FAILURE REMAINS
UNCURED FOR 5 WORKING DAYS ATER WRITTEN NOTICE THEREOF
. . . .

GOVERNING LAW

THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE
CONSTRUCTION, VALIDITY AND PERFORMANCE OF THIS CONTRACT . . .
.

Affidavit of Bruce G. Paulsen, dated May 27, 2011 ("Paulsen

Aff."), Exhibit 11 (the "Contract").

In August 2010, Kolmar nominated the motor tanker Formosa

Ten as the performing vessel to load Koch's September delivery of

the Product (the "September Product").  Kolmar's 56.1 Response ¶

21. Shortly thereafter, Kolmar chartered the Formosa Ten.  Id. ¶

23. The charter provides, among other things, a "laycan" of September 15 2010 to September 30, 2010, and specifies that the terms and conditions of the Asbatankvoy form charter party apply. See Paulsen Aff. Ex. 15. With respect to Notice of Readiness ("NOR"), clause 6 of the Asbatankvoy form charter party provides that "[u]pon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth." See Paulsen Aff. Ex. 16.

On September 9, 2010, Koch informed Kolmar that the September delivery would be on a split basis between Houston and Corpus Christi. See Kolmar's 56.1 Response ¶ 26. On September 13, 2010, Kolmar informed Koch that the Formosa Ten's estimated times of arrival ("ETAs") for Houston and Corpus Christi were September 24 and September 28, respectively. Id. ¶ 27. On September 14, 2010, Kolmar elected to exercise its (+/-5%) volume option so as to load a total of 10,100 metric tons of Product for September 2010. Kolmar 56.1 ¶ 21. On September 15, 2010, Kolmar informed Koch that the Formosa Ten had changed its rotation to reflect ETAs of September 24 for Corpus Christi and September 26 for Houston. Kolmar's 56.1 Response ¶ 28. On September 15, 2010, Koch requested that Kolmar switch the rotation back to the

original order, because Koch had been informed by its supplier
that the cargo for the Corpus Christi lifting would not be
available until September 26; Kolmar expressed a willingness to
accommodate this request to the extent within Kolmar's control.
Id. ¶ 29. On September 22, 2010, Kolmar informed Koch that the
Formosa Ten's rotation had been switched per Koch's request.  Id.
¶ 30.  However, Kolmar continued, as late as September 27, to
receive ETAs from the Vessel's agent reflecting an arrival in
Corpus Christi prior to an arrival in Houston, which Kolmar
forwarded to Koch.  Id. ¶ 31.

On September 27, 2010, Katie Bair of Koch informed Harald
Lund of Kolmar that if the Formosa Ten did not arrive within
September, Orly Sandelowsky of Kolmar would have to contact
Raymond Groeneveld of Koch regarding a financial amendment to the
contract.  Id. ¶ 32.  On September 28, 2010, Kolmar informed
Koch that the Formosa Ten had changed its rotation and was
estimated to arrive in Houston on September 29 and in Corpus
Christi on October 1.  Id. ¶ 34.  Upon receiving Kolmar's
September 28 communication, Koch asked Kolmar whether the Formosa
Ten would tender NOR for Corpus Christi in September, to which
Kolmar responded, "[t]hat is the plan."  Id. ¶ 35.  Koch advised
Kolmar that it believed an arrival at Corpus Christi in October
would be outside of the contractual delivery window, and that it

intended to hold Kolmar responsible for any costs associated with an October lifting.  Id. ¶ 36.

On September 29, 2010, Steen Pederson of Biehl & Co. LP ("Biehl"), the agent for the Formosa Ten, transmitted an email message that read, in pertinent part: "NOTICE OF READINESS. Please be advised that subject vessel is in every respect ready to load below cargo as of 1200hrs today Wednesday, September 29, 2010."  Koch Supply & Trading, LP's Responses and Objections to Kolmar Americas, Inc.'s Local Rule 56.1 Statement ("Koch's 56.1 Response") ¶ 30.  The Formosa Ten commenced loading of the Product in Houston at approximately 2350 hours on September 29, 2010, and completed loading at approximately 1200 hours on September 30, 2010.  Id.  This delivery will be referred to below as the "Houston Delivery."  Koch loaded 4,748 metric tons of Product onto the Formosa Ten during the Houston Delivery. Kolmar's 56.1 Response ¶ 44.

In the final days of September, Koch and Kolmar exchanged a lengthy series of messages regarding the Formosa Ten's arrival in Corpus Christi (the "Corpus Christi Delivery").  Kolmar's 56.1 Response ¶ 40.  On September 29, Groeneveld (Koch) indicated to Sandelowsky (Kolmar) that Koch's own supplier, ICC Chemical Corporation ("ICC"), was likely to charge an additional 10 cents per gallon ("cpg") if the Formosa Ten arrived in Corpus Christi

after the expiration of the September 30 contractual window.  See
Declaration of James E. Nealon, dated May 27, 2011 ("Nealon
Decl."), Ex. JJ.  Sandelowsky responded with an email setting
forth, *inter alia*, Kolmar's position that time was not of the
essence and that Koch would be in breach of contract if it tried
to charge Kolmar a higher price or cancel the Corpus Christi
shipment.  Id. ("[W]e expect Koch to load our 5,000 MT from
Corpus Christi onto the Formosa Ten when it tenders NOR at the
port, without delay or costs, and we expect that the cargo is
priced as per the agreement for September pricing.").  Later the
same day, Groeneveld informed Sandelowsky that ICC had asked Koch
to pay "+6cpg price adjustment in case the vessel tenders NOR
from October 01 till midnight October 02 2010.  If NOR loading
Corpus [Product] after midnight on October 02 2010, the price for
the 5kt [Product] will be adjusted as calculated as the Contract
Price for [October]."  Nealon Decl. Ex. OO.  Sandelowsky
responded with the following email:

> If the Formosa 10 tenders NOR Corpus after September, we can
> agree to the following:
> 1st October: 1 cpg extra
> 2nd October: 2cpg extra
> 3rd October or later: 3cpg extra
> Upon your agreement we will amend lc [the letter of credit]
> accordingly.
> Await your confirmation

Paulsen Aff. Ex. 42 (email from Orly Sandelowsky to Raymond
Groeneveld).

On the morning of September 30, Groeneveld wrote back to Sandelowsky: "[o]ur supplier is very clear in this matter and they stay with the original proposal, presented to you yesterday."  Paulsen Aff. Exs. 43 and 45.  He asked that Sandelowsky "[p]lease confirm acceptance and make LC [letter of credit] amendment accordingly."  Id.  He sent a follow-up email several hours later indicating that if Kolmar failed to respond by noon, "the remaining 5kt Sept MX commitment will be null and void."  Paulsen Aff. Ex. 45.

Shortly before noon on September 30, Sandelowsky responded with the following communication:

> Notwithstanding that Kolmar is performing our contract to lift our September volume commitment, and that that volume should be priced based on September's pricing scheme . . . , your position has given us little choice except to amend our LC to reflect the extra six cents per gallon you are demanding from us in order to load the vessel.  We feel we have no choice in doing this so as to maintain our commitments to our customers for this parcel.  Turning a logistics situation beyond Kolmar's control into a material financial benefit for Koch is tantamount to extortion.
>
> Turning to practical matters, as of now, the MT Formosa 10 is currently due to tender NOR in Corpus Christ at 07:00 on 2nd October.
>
> Notwithstanding the above and our good faith efforts to resolve this issue, Kolmar has not changed its position per our email to you yesterday afternoon, stating that we are within our rights, entitled to load the 5,000MT out of Corpus at no extra cost, and at the September U.S.MX Contract Price Range as published by CMAI.

10

Nealon Decl. Ex. PP; Paulsen Aff. Ex. 46.  In his reply to this message, Groeneveld expressed Koch's position that it was merely passing on its own costs to Kolmar.  Nealson Decl. Ex. QQ; Paulsen Aff. Ex. 47.  He asked Sandelowsky to "[p]lease confirm to us at your earliest opportunity that you intend to receive the product as currently scheduled on October 2 for the scheduled price plus six-cents per gallon."  Id.  Sandelowsky replied: "[p]er our previous email today, we have already advised you that the LC is being amended to accommodate the extra cpg."  Nealon Decl. Ex. RR.

    The following day (October 1), Harald Lund of Kolmar sent an email to Katie Blair of Koch stating: "please find attached, the L/C amendment for the Formosa 10.  Please confirm acceptance."  Paulson Aff. Ex. 51.  Several hours later, Sandelowsky wrote the following message to Groeneveld:

> The MT Formosa 10, per separate email sent to your operations, copied to you is currently showing that NOR will be tendered Corpus Christi late PM 2nd October 2010.
>
> Please confirm that when the vessel does tender NOR that you will load us upon arrival. Price has always been, and will continue to be September US M.X Contract Price Range as published by CMAI. The LC amendment you have already received today allows for the extra six cents per gallon extra cost, which you claim to have incurred directly as a result of our vessel tendering NOR outside of September 2010 at the 2nd loadport for our September parcel.

Nealon Decl. Exs. OO and TT.  This email initiated the following exchange between Groeneveld and Sandelowsky, which is reproduced below for the sake of completeness:

[Email from Groeneveld to Sandelowsky (October 1, 2010):]

We acknowledge that you have increased the LC face amount to reflect the additional 6 cpg, but your emails continue to draw a confusing distinction between the price und the LC amount. Please speak clearly and acknowledge that you are prepared to keep [Koch] whole by including the additional 6cpg in the price paid. This would be important language for us before we release the cargo completely.

In case we receive the above confirmation, If the MT Formosa 10 tenders NOR from the sea buoy at Corpus prior to 23:59 on Oct 2nd, then we will load 5,000MT of the product at a revised price reflecting the original price plus the additional 6 cpg late-loading cost being passed down to us.

[Email from Sandelowsky to Groeneveld (October 1, 2010):]

There is nothing left to confirm. You have already received from the bank a copy of the LC amendment that covers the extra 6 cpg cost you added to the parcel and which we have agreed to pay, with a full reservation of rights.

Kolmar expects and insists that Koch load the vessel when it arrives. Any failure to do so will result in serious legal consequences and we will hold Koch responsible for any resulting damages. Additionally, any failure to load the parcel would be a material breach excusing Kalmar, at its option, from the remainder of its future purchase obligations under the master agreement.

[Email from Groeneveld to Sandelowsky (October 1, 2010):]

It is not acceptable to agree, but also reserve rights. As you know, Koch has incurred additional charges from its supplier in the amount of 6 cents per gallon. These costs have arisen solely due to the failure of Kalmar's logistics and the consequences could have been cancellation by Valero of the September volume. If you arrive on time and agree to pay the revised price without reservation, then we are more than willing to perform. If you do not, then we will cancel

delivery of the September volume and reserve [Koch]'s rights.
If it should come to pass that we need to make alternative
arrangements for loading of product at Corpus this weekend, it
is imperative that we receive a response from you by 09.00 PM
Houston time today.

[Email from Groeneveld to Sandelowsky (October 2, 2010):]

Please be advised that if your vessel tenders NOR at or before
11:59 pm this evening (October 2), we will deliver the
September volume at the revised rates (September rates plus
the 6 cents per gallon charged to us from our supplier). If
your vessel has not arrived by this time, we will cancel
delivery of the September volume and reserve all relevant
rights. As a consequence of your failure to respond to my
email from last evening requesting confirmation of your intent
to perform, we have incurred additional expenses for which we
also express a full reservation of right

Nealon Decl. Ex. OO.

     The parties give divergent accounts of subsequent events.

According to Koch, it informed ICC and ICC's supplier, Valero,

that if the Formosa Ten tendered NOR by 2359 hours on October 2,

Valero was to load the vessel.  See Koch Supply & Trading, LP's

Memorandum of Law in Support of its Motion for Summary Judgment

("Koch Mem.") at 7.  If the Formosa Ten did not tender NOR by

that time, however, Valero was to load the barges that Koch had

procured as a contingency plan.  Id.  Late that evening, Captain

Kenneth Todd Olson (the "Pilot") boarded the pilot boat scheduled

to rendezvous with the Formosa Ten at midnight.  Id. (citing Koch

56.1 ¶ 82).  The Pilot, communicating with the Formosa Ten via

VHF radio, requested an ETA but received only a "vague" response.

Id. (citing Koch 56.1 ¶ 83).  The Pilot attempted to locate the

Formosa Ten on the Automatic Identification System ("AIS"), but
he was unable to do so.  Id. at 7-8 (citing Koch 56.1 ¶ 85).
According to Koch, "[s]hortly before midnight on October 2 . . .
the pilot was cancelled and the Vessel was sent to anchorage
after it was determined by Valero and the Corpus Christi Harbor
Master's Office that the Vessel would not arrive by 2359 hours."
Id. at 8 (citing Koch 56.1 ¶ 87).[3]  Koch maintains that it was
not until approximately 12:35 a.m. on October 3 Steen Pederson of
Biehl sent a message to Kolmar, Valero, and others, that stated:
"Please be advised that [the Formosa Ten] is in every respect
ready to load [the September Product] as of 2320 hours Saturday
2nd October 2010."  Koch 56.1 ¶ 100.

Kolmar, however, highlights the Captain's testimony that he
communicated with the Pilot at 2330 hours on October 2 and was
instructed to bring the vessel to the # 3 buoy, not the AP buoy.
See Plaintiff's Memorandum of Law in Opposition to Defendant's
Motion for Summary Judgment ("Kolmar Opp'n") at 14 (citing
Deposition of Captain Chou Kou Shang, dated June 14, 2011
("Captain Dep.") at 116:8-116:22)).  Kolmar contends that the
Captain gave firm ETAs to the Pilot of about 2345 hours.  Id.
(citing Captain Dep. At 116:8-117:6)).  He further advised the

_____

[3] According to Koch, Mr. Danny Rodriguez of Biehl later conceded
that, as of 2355 hours, the Formosa Ten had yet to reach the AP
Buoy.  Koch Mem. at 8 (citing Koch 56.1 ¶ 90).

14

Pilot that the Formosa Ten's ETA was prior to midnight and that
it would certainly arrive at either the AP Buoy or the # 3 Buoy
prior to midnight.  Id. at 14-15 (citing Captain Dep. at 39:16-
39:20; 118:14-118:24).  Additionally, "the Captain testified that
he made contemporaneous marks on the ship's navigational chart to
show the location of the Vessel at 2320, 2330, 2340 and 2348
hours on October 2, 2010 – all of which show that the Vessel
arrived at Corpus Christi well before midnight."  Id. at 15
(citing Captain Dep. at 106:5-107:16; 124:7-124:16)).

     It is undisputed that, on October 4, 2010, Koch formally
notified Kolmar that the remainder of the September delivery was
cancelled.  Koch 56.1 ¶ 110.

     With this lengthy background in mind, the Court turns to the
parties' respective motions.  Kolmar first argues that it should
be granted partial summary judgment as to liability on its
contract claim pertaining to the Houston Delivery.  See, e.g.,
Plaintiff's Memorandum of Law in Support of Motion for Partial
Summary Judgment ("Kolmar Mem.") at 2.  The Court agrees.  It is
undisputed that Koch loaded 4,748 metric tons of Product onto the
Formosa Ten during the Houston Delivery.  Kolmar's 56.1 Response
¶ 44.  The Contract, however, provided for "TWO (2) 5000 METRIC
TON LIFTING'S PER MONTH," plus or minus five percent at the
buyer's option.  See Paulsen Aff. Ex. 11 at 2.  The only logical

interpretation of this provision is that Koch was required to deliver two equal parcels of Product at two separate "lifting's." Accordingly, because Kolmar exercised its option to load a total of 10,100 metric tons of Product during the month of September, Koch was obligated to load 5,050 metric tons of Product during the first "lifting."  Kolmar 56.1 ¶¶ 30-33.

Koch's arguments to the contrary are unavailing.  Although it is true, as Koch contends, that the Contract does not explicitly state that the two lifting's must be of precisely equal weight, it cannot be the case that Koch was free to deliver any arbitrarily-chosen percentage of the total Product during the first lifting.  Extending this argument to its logical conclusion, Koch's interpretation would permit it to deliver any amount of Product, from zero to 10,100 metric tons, during the first lifting, an outcome that cannot be squared with the Contract's specification that Koch deliver "TWO (2) 5000 METRIC TON LIFTING'S PER MONTH."  Paulsen Aff. Ex. 11 at 2 (emphasis added).[4]  Koch's related argument, that it was deprived of the opportunity to cure its shortfall because the Formosa Ten failed

---

[4] Koch itself practically concedes this point, noting that it "offered to compensate Kolmar for any purported 'short load' on October 4, 2010, two days after the events herein occurred, and before this action was filed. . . . Kolmar, however, failed to respond, instead resorting to the Court for relief on this minor point."  Koch Supply & Trading, LP's Memorandum of Law in Opposition to Kolmar Americas, Inc.'s Motion for Partial Summary Judgment ("Koch Opp'n") at 23.

16

to timely arrive in Corpus Christi, is similarly without merit.
Regardless of which party was at fault for subsequent events, a
question discussed in detail below, the inescapable fact remains
that Koch never delivered the amount of Product it was
contractually obligated to deliver during the first lifting.
Koch is therefore required to compensate Kolmar for the 302
metric tons of Product it failed to deliver during the Houston
Delivery.  For the foregoing reasons, the Court hereby grants
Kolmar partial summary judgment as to liability on its contract
claim pertaining to the Houston Delivery.

The parties' remaining motions are all addressed to the same
question: whether Kolmar or Koch breached the Contract with
respect to the Corpus Christi Delivery.  Koch's argument that
Kolmar breached the Contract is premised on the following four
subpoints: (1) time was of the essence under the Contract; (2)
Kolmar breached the Contract by missing the September delivery
window; (3) the parties never agreed on an alternative deadline
for delivery; and (4) even assuming, arguendo, that the parties
agreed to extend the delivery window, Kolmar never tendered NOR
before the extended deadline of midnight on October 2, 2010.
Kolmar argues, on the other hand, that (1) time was not of the
essence under the Contract; (2) Koch extended the delivery period
through and including midnight on October 2, 2010; (3) Kolmar's

17

vessel tendered its NOR prior to the extended deadline; and (4) Koch breached the Contract by canceling delivery to the Formosa Ten.

Addressing each of these subpoints in turn, the Court first concludes that time was of the essence under the Contract. "The determination of whether a contract term is ambiguous is a threshold question of law for the court," Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987), and here the Court finds no ambiguity in the Contract's requirement that the parties perform their respective obligations "BETWEEN 1 SEPTEMBER AND 2010 AND 30 SEPTEMBER 2010."[5] Paulsen Aff. Ex. 11 at 1. Under New York law, which governs the Court's interpretation of the Contract here at issue, "[w]here a definite time of performance is specified in a contract, time is of the essence unless the circumstances affirmatively indicate a contrary intent . . . ." Sparks v. Stich, 135 A.D.2d 989, 991 (3d Dep't 1987) (citing 22 N.Y. Jur. 2d, Contracts, §§ 247, 248 at 97, 99). See also Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990) ("New York law requires that contract provisions specifying dates for

---

[5] See also Paulsen Aff. Ex. 11 at 2 ("The BUYER MUST NOMINATE A TEN DAY LAYCAN WINDOW TEN DAYS PRIOR TO THE CONTRACT WINDOW.  TEN DAYS PRIOR TO THE BEGINNING OF THE NOMINATED LAYCAN, BUYER MUST NARROW LAYCAN TO FIVE DAYS WITHIN THE ORIGINAL LAYCAN WINDOW. FIVE DAYS PRIOR TO THE FIVE DAY LAYCAN, BUYER MUST NARROW THE LAYCAN TO THREE DAYS WITHIN THE FIVE DAY LAYCAN.").

18

performance be strictly enforced in a contract action at law. In such an action, the parties are presumed to have agreed that time is of the essence unless there is contract language to the contrary."). Accordingly, because the Contract at issue clearly specifies a definite time of performance, time was of the essence under this agreement unless circumstances or the language of the Contract evidences a contrary intent.

There is no evidence of a contrary intent in this case. Although the Contract specifies that the "BUYER MAY CHANGE DELIVERY SCHEDULES AND TEMPORARILY SUSPEND SCHEDULED SHIPMENTS," this option is permitted only "TO THE EXTENT FLEXIBILITY IS ALLOWED BY THIS AGREEMENT." Paulsen Aff. at 7. While the Contract arguably allows for flexibility in scheduling of the laycan, it provides no such flexibility with respect to the delivery window. If, for example, Kolmar had nominated a ten-day laycan of September 10 through September 20, the Contract arguably permitted delivery beyond September 20 if Kolmar's vessel encountered delays. However, the Contract requires that the laycan window fall within the 30-day delivery window; thus, because Kolmar nominated a laycan ending on the very last day of the delivery window (September 30, in this instance), the Contract allowed for no flexibility in meeting the deadline. As Koch points out, "[t]o interpret the Contract as granting Kolmar

19

the absolute right to defer deliveries would render the delivery
windows and the cancellation clause meaningless, and violate a
fundamental principle of contract law." Koch Opp'n at 21. <u>See</u>
<u>United States ex rel. Mathusek Inc. v. J. Kokolakis Contr., Inc.</u>,
No. 05 Civ. 9097 (WCC), 2007 U.S. Dist. LEXIS 44567, at *11
(S.D.N.Y. June 19, 2007) (stating that a contract "should be
construed so as to give full meaning and effect to all of its
provisions") (internal quotation marks and citations omitted)).

Similarly, although the Contract defines default as "THE
FAILURE OF THE DEFAULTING PARTY TO COMPLY WITH ITS OTHER
OBLIGATIONS UNDER THIS CONTRACT AND SUCH FAILURE <u>REMAINS UNCURED</u>
<u>FOR 5 WORKING DAYS</u> ATER WRITTEN NOTICE THEREOF," Paulsen Aff. Ex.
11 at 9 (emphasis added), untimely delivery is self-evidently an
uncurable breach. Koch Opp'n at 22. An opportunity to cure a
breach otherwise required under a contract is inapplicable where
"the nonconforming tender is that defendant failed to timely
[perform] pursuant to a time of the essence contract." <u>Vitol</u>
<u>S.A., Inc., LP</u>, No. 01CV2184 (GBD), 2005 U.S. Dist. LEXIS 18688,
at *35 (Aug. 31, 2005). Under such circumstances, "it is
impossible for defendant to cure the defective [performance] by
re-tendering . . . at an even later date." <u>Id.</u>[6]

---

[6] <u>See also Chemetron Corp. v. McLouth Steel Corp.</u>, 381 F. Supp.
245, 254 n.14 (N.D. Ill. 1974) ("Where the seller has repudiated
or failed to make a delivery, the buyer may proceed directly to a
remedy. No rejection or notice is needed, most probably because

Moreover, even if, contrary to fact, there were some ambiguity in the Contract's provisions, a court may conclude that time is of the essence as a matter of law "where there is something in the nature of the subject matter, or connected with the purpose of the contract and the circumstances surrounding it which makes it apparent that the parties intended that the contract be performed at or within the time specified." Vitol S.A., Inc. v. Koch Petroleum Group, LP, No. 01CV2184 (GBD), 2005 U.S. Dist. LEXIS 18688, at *27 (S.D.N.Y. Aug. 31, 2005) (citations and barackets omitted). Contracts involving the sale of a commodity with a fluctuating price and a delivery window "are customarily considered to be time of the essence contracts." Id. See also Lusker v. Tannen, 90 A.D.2d 118, 124 (1st Dep't 1982). Here, there is no dispute that the Contract involved the sale of a commodity with a fluctuating price; indeed the market-price for the Product in the Texas area had risen approximately $0.45 per gallon from September 2010 to October 2010. See Kolmar 56.1 Response ¶ 37. Accordingly, the Court concludes that time was of the essence as a matter of law.

Given that time was of the essence, it follows that Kolmar breached the Contract by missing the September 30, 2010 delivery

---

the seller in these cases reasonably should know that he has not performed.") (internal quotation marks and citation omitted), aff'd, 522 F.2d 469 (7th Cir. 1975)).

21

deadline, and that Koch had the right to cancel the Contract
following this breach.  See Friedman v. O'Brien, 287 A.D.2d 311,
311-12 (1st Dep't 2001) (upholding seller's right to cancel under
a time of the essence agreement); Mohen v. Mooney, 162 A.D.2d
664, 666 (2d Dep't 1990) ("[W]hen the buyers failed to appear for
the scheduled closing on October 31, 1988, they were in default .
. . ."); N.Y. U.C.C. § 2-703 ("Where the buyer wrongfully rejects
or revokes acceptance of goods or fails to make a payment due on
or before delivery or repudiates with respect to a part or the
whole . . . the aggrieved seller may . . . (f) cancel."); id.
cmt. 1 ("This section is an index section which gathers together
. . . all of the various remedies open to a seller for any breach
by the buyer.").  Indeed, the Contract explicitly provides that
"[Koch] HAS AT ITS SOLE OPTION THE RIGHT TO CANCEL THIS AGREEMENT
IF THE NOR IS NOT TENDERED IN THE AGREED DELIVERY PERIOD."
Paulsen Aff. Ex. 11 at 4.  Accordingly, unless the parties agreed
to modify the terms of the Contract, a question discussed in
detail below, Kolmar was in breach of the Contract as of midnight
on September 30, 2010.

It is black-letter law that "the fundamental basis of a
valid, enforceable contract is a meeting of the minds of the
parties. If there is no meeting of the minds on all essential
terms, there is no contract."  Sara Corp. v. Saintly Int'l Am.,

Inc., No. 05 Civ. 2944 (JCF), 2008 U.S. Dist. LEXIS 58049, at
*31-32 (S.D.N.Y. Aug. 1, 2008) (citation omitted).  See also N.Y.
U.C.C. § 2-305(4) ("Where . . . the parties intend not to be
bound unless the price be fixed or agreed and it is not fixed or
agreed there is no contract."); Beacon Terminal Corp. v.
Chemprene, Inc., 429 N.Y.S.2d 715, 718 (App. Div. 1980)
("[F]undamental to the establishment of a contract modification
is proof of each element requisite to the formulation of a
contract, including mutual assent to its terms.").  In this case,
it is clear from the undisputed facts in the record that no
modified agreement was ever formed.  On September 29, 2010, Koch
made the following offer to Kolmar: "+6cpg price adjustment in
case the vessel tenders NOR from October 01 till midnight October
02 2010.  If NOR loading Corpus [Product] after midnight on
October 02 2010, the price for the 5kt [Product] will be adjusted
as calculated as the Contract Price for [October]."  Nealon Dec.
Ex. OO.  Kolmar never agreed to this offer.  To the contrary,
Kolmar continued to insist that the price remained "the September
U.S.MX Contract Price Range as published by CMAI."  Nealon Decl.
Ex. PP; Paulsen Aff. Ex. 46.[7]

---

[7] See also Nealon Decl. Exs. OO and TT ("Price has always been,
and will continue to be September US M.X Contract Price Range as
published by CMAI.").

Kolmar argues that its reservation of rights did not operate as a rejection of the proposed modification.  See Kolmar Opp'n at 12.  It contends that under the New York Uniform Commercial Code, a party "who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved."  N.Y.U.C.C. § 1-207.  The obvious problem with this argument, however, is that Section 1-207 permits reservation of rights only with respect to contract *performance*, not contract *formation*.  Conditional acceptance is invalid under the New York Uniform Commercial Code, which requires a "definite and seasonable expression of acceptance."  N.Y. U.C.C. § 2-207(1).[8]  Thus, since Kolmar indisputably failed to perform by

---

[8] See also Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp., 567 F. Supp. 2d 579, 593 (S.D.N.Y. 2008) (rejecting seller's contract claim premised on waiver when buyer's willingness to accept a delay in performance that was otherwise subject to a time is of the essence agreement was "entirely conditional [and] . . . contingent on an agreement for financial compensation. . . . [and] [n]o such agreement was ever reached"); Sara Corp. v. Sainty Int'l Am., Inc., 2008 U.S. Dist. LEXIS 58049 (S.D.N.Y. Aug. 1, 2008) ("This series of communications demonstrates several things. First, no delivery date was ever agreed upon by the parties, though that was clearly a material term. The only delivery date that Sainty was willing to agree to was January 15, a date that Sara acknowledged that it could not meet. Second, Sainty implied its intent not to be bound until it expressed its final agreement by opening a letter of credit, which never occurred. Finally, even though there was a tentative agreement with respect to per unit prices, there was no meeting of the minds on an overall contract price because there was still uncertainty as to the amount of credit Sainty would receive against the sample costs. Accordingly, there was no

the September 30, 2010 deadline, it had no rights to reserve, and Section 1-207 is inapplicable.

Kolmar also argues that its agreement to amend its letter of credit created a new, enforceable agreement. Kolmar is incorrect. A letter of credit is a separate, independent contract, and an agreement to amend the letter of credit is not equivalent to an agreement to modify the Contract. See Mutual Export Corp. v. Westpac Banking Corp., 983 F.2d 420, 423 (2d Cir. 1993) ("Letters of credit are unique commercial instruments. . . . Credits, by their nature, are transactions separate from the sales or other contract(s) on which they may be based . . . .") (internal quotation marks and citations omitted); KMW Int'l. v. Chase Manhattan Bank, N.A., 606 F.2d 10, 15 (2d Cir. 1979) ("As a matter of law, a bank's obligation under a letter of credit is totally independent of the underlying transaction").[9] Thus, the

---

enforceable contract, and Sara cannot recover on its Third Cause of Action.").

[9] See also Alaska Textile Co. v. Chase Manhattan Bank, N.A., 982 F.2d 813 (2d Cir. 1992):

In its classic form, the letter of credit is only one of three distinct relationships between three different parties: (1) the underlying contract for the purchase and sale of goods between the buyer ("account party") and the seller ("beneficiary"), with payment to be made through a letter of credit to be issued by the buyer's bank in favor of the seller; (2) the application agreement between the bank and the buyer, describing the terms the issuer must incorporate into the credit and establishing how the bank is to be reimbursed when it pays the seller under the letter of credit; and (3)

fact that Kolmar amended its letter of credit in no way establishes its acceptance of Koch's offer.

Perhaps recognizing that it never explicitly agreed to Koch's proposed modification,[10] Kolmar devotes the majority of its opposition papers to arguing that contractual modification can be established not only by express agreement but also by conduct, part performance and waiver/estoppel.  See Kolmar Opp'n at 5-13; see also Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) ("Under New York law, parties may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel.") (internal quotation marks omitted); N.Y. U.C.C. § 2-207(3) ("Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.").  In this

---

the actual letter of credit which is the bank's irrevocable promise to pay the seller-beneficiary when the latter presents certain documents (e.g., documents of title, transport and insurance documents, and commercial invoices) that conform with the terms of the credit.

The great utility of the letter of credit derives from the fact that these relationships are utterly independent of one another[.]

Id. at 815 (internal citations omitted).

[10] Indeed, the Court finds it telling that Kolmar fails to point to any specific communication in which it agrees to the offer, referring the Court instead to 13 paragraphs from its 56.1 statement.  See Kolmar 56.1 ¶¶ 34-47.

case, Kolmar argues that Koch's own witnesses admitted that Koch agreed to extend the delivery deadline, and that all of Koch's actions/conduct after September 30th were consistent with the agreed-to extension.  See Kolmar Opp'n at 7-8.  Kolmar cites, for example, the testimony of Randy Bitante, Koch's trading manager of U.S. Gulf Aromatics, Katie Bair, Koch's primary logistics/operational person for the Kolmar transaction, and Becky Good, another senior Koch logistics person who was involved in the transaction.  Those witnesses testified to the effect that personnel for Koch were closely watching the vessel's progress and had been instructed to load the Formosa Ten if it arrived before midnight on October 2, 2010.[11]  Kolmar further argues that the email exchanges between the parties, particularly Groeneveld's October 2, 2010 email to Sandelowsky, copied below, "indisputably evidence[] Koch's unconditional agreement to extend the deadline":

> Please be advised that if your vessel tenders NOR at or before 11:59 pm this evening (October 2), we will deliver the September volume at the revised rates (September rates plus the 6 cents per gallon charged to us from our supplier). If your vessel has not arrived by this time, we will cancel delivery of the September volume and reserve all relevant rights. As a consequence of your failure to respond to my

---

[11] See, e.g., Bair Dep. at 91:7-95:14; 188:8-190:21; 295:3-11 (testifying that she had stayed awake until 2:00 a.m. on Sunday morning, October 3rd waiting to see if the FORMOSA TEN arrived in Corpus Christi and to coordinate the barges hired by Koch as alternative vessels after Valero turned away the FORMOSA TEN just before midnight).

email from last evening requesting confirmation of your intent
to perform, we have incurred additional expenses for which we
also express a full reservation of rights.

Nealon Decl. Ex. WW.  Finally, Kolmar points out that Andrea

Chionsini of Valero confirmed that Koch had indicated the

delivery deadline had been extended until midnight on October 2,

2010.  See, e.g., Chionsini Dep. at 79:25-86:24.

    As an initial matter, the Contract specifies that any

modifications or waivers to the Contract must be in writing.  See

Paulsen Aff. Ex. 11 at 15 ("NO WAIVER BY EITHER PARTY OF ANY

RIGHT, POWER OR REMEDY OR OF ANY PROVISION OF THIS CONTRACT SHALL

BE EFFECTIVE UNLESS IT IS EXPRESSLY MADE AND REDUCTED TO

WRITING.").  Accordingly, Kolmar can show that it agreed to the

proposed modification through its performance only if that

performance was "unequivocally referable to the new contract."

See Merrill Lynch Interfunding, Inc. v. Argenti, 978 F. Supp.

151, 162 (S.D.N.Y. 1997) ("[U]nder New York law, partial

performance of an oral modification validates a contract

otherwise barred by no-oral-modification provisions and by

section 15-301(1). That performance must be 'unequivocally

referable' to the new contract."), rev'd on other grounds, 155

F.3d 113 (S.D.N.Y. 1997).  See also Dallas Aero., Inc. v. CIS Air

Corp., 352 F.3d 775, 783 (2d Cir. 2003) ("[F]or a course of

performance to demonstrate mutual assent to a modification, it

28

must be 'unequivocally referable' to the modification.") (quoting
Rose v. Spa Realty Assocs., 366 N.E.2d 1279, 1283, (N.Y. 1977)).
Similarly, "for conduct to amount to a waiver or estoppel, it
must not otherwise be compatible with the agreement as written;
rather, the conduct of the parties must evidence an indisputable
mutual departure from the written agreement." Id. (internal
quotation marks and brackets omitted).

     None of the evidence cited by Kolmar comes close to
satisfying these rigorous standards.  It is clear that Koch never
waived its rights: at all times it expressly conditioned its
offer upon Kolmar's unequivocal acceptance of a six cent-per-
gallon price increase.  Furthermore, the testimony of the Koch
employees concerning *Koch's conduct* is irrelevant to whether
*Kolmar's actions* demonstrate an unequivocal acceptance of Koch's
offer.  As Koch points out, the testimony of the four individuals
cited by Kolmar, none of whom were involved in the negotiations
at issue, at best shows only that Koch unilaterally agreed to its
*own offer*.  See Koch Supply & Trading, LP's Reply Memorandum of
Law in Further Support of Its Motion for Summary Judgment ("Koch
Reply" at 5).  Similarly, Groenveld's emails simply confirmed the
terms of Koch's offer, which was at all times made conditional on
Kolmar's clean acceptance.  Id.

The relevant question is whether *Kolmar's actions*
demonstrate acceptance of Koch's offer, and the Court concludes
as a matter of law that they did not.  Again, as Koch points out,
its offer was made contingent upon Kolmar's agreement to the
following terms: (1) that Kolmar agree to pay an additional 6
cents per gallon; and (2) that the Formosa Ten tender a valid NOR
from the AP Buoy point prior to 2359 hours on October 2, 2010.
Id. at 6.  By agreeing to the first term, if at all, only "under
protest" and with a full reservation of rights, no reasonable
juror could conclude that Kolmar's conduct was "unequivocally
referable" to an acceptance of Kolmar's offer.  Moreover, by now
stating that it "intended to litigate [the price increase] in
this action," Kolmar Opp'n at 13, Kolmar in effect concedes that
it never agreed to pay the six-cent price increased offered by
Koch.

In sum, the Court concludes (1) that time was of the essence
under the Contract; (2) that Kolmar breached the Contract by
failing to meet the September 30, 2010 deadline; and (3) that
Kolmar never accepted Koch's proposed modification of the
Contract's terms.  It follows that Koch was entitled to cancel
the Contract, and that it is irrelevant whether or not Kolmar
tendered NOR prior to midnight on October 2, 2010.

30

For the foregoing reasons, the Court grants Kolmar partial summary judgment as to liability on its contract claim pertaining to the Houston Delivery, and grants Koch partial summary judgment as to liability on its contract counterclaim with respect to the Corpus Christi Delivery.  All other motions are denied.  The parties are instructed to convene a joint conference call to Chambers by no later than December 22, 2011 to schedule further proceedings in this case, including an inquest on damages.  The Clerk of the Court is directed to close item numbers 9 and 11 on the docket of this case.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          December 14, 2011

31